**JESSICA A. BETLEY**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 3447**
**119 First Ave. North, Suite 300**
**Great Falls, MT 59401**
**Phone: (406) 761-7715**
**FAX: (406) 453-9973**
**E-mail: Jessica.Betley@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 12-51-GF-BMM** |
| **Plaintiff,** | |
| **vs.** | **UNITED STATES' RESPONSE TO DEFENDANT'S REQUEST FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)** |
| **LOUIS JAMES ROMERO,** | |
| **Defendant.** | |

The defendant, Louis James Romero, has filed a motion requesting the Court reduce his sentence to a term of time served under 18 U.S.C. § 3582(c)(1)(A)(i) under the guise of the COVID-19 pandemic. However, Romero's motion to reduce his sentence is on the basis that he disagrees with his career offender classification, and all of his prior litigation to reduce his sentence has failed.

1

Romero is currently serving a 235-month sentence for the crime of conspiracy to possess with intent to distribute cocaine. *See* Judgment (Doc. 114). Romero is an inmate at Edgefield FCI in Edgefield, South Carolina, and his projected release date is March 31, 2029. *See* Inmate Locator, www.bop.gov/inmateloc (accessed January 16, 2021). As of January 16, 2021, there are 37 inmates and 22 staff members who currently test positive for Covid-19 at Edgefield FCI. One inmate has died from Covid-19. 171 inmates and ten staff members have recovered from Covid-19 at the Edgefield FCI. *See* Interactive Map, www.bop.gov/coronavirus (accessed Nov. 24, 2020).

Romero's motion should be denied because: (1) he has not met the "extraordinary and compelling reasons" standard under the First Step Act, (2) he remains a danger to the community, and (3) his release would not be justified under the 18 U.S.C. § 3553(a) factors.

## FACTS

### I.      Romero's Offense, Sentence, and Time in Custody

In 2011, law enforcement in Great Falls, Montana, uncovered a large-scale drug ring that was orchestrated by conspirators out of California and Washington, which included Romero. PSR ¶¶ 14-20. Romero was primarily responsible for distributing cocaine, and he sent subordinates to other states to distribute drugs on his behalf. PSR ¶¶ 18-19.

In addition, during the course of the conspiracy, Romeo provided the undercover informant with a firearm, kicked in a door and demanded to know where two pounds of methamphetamine had gone, and pistol whipped another informant in the head. PSR ¶ 38. At the conclusion of the conspiracy, and just prior to Romero's arrest, Romero provided another co-defendant with five bags of methamphetamine to take from Seattle to Montana for distribution. PSR ¶ 40.

The grand jury issued an indictment against Romero in July 2012. On August 23, 2012, Romero pleaded guilty to the crime of conspiracy to possess with intent to distribute cocaine. (Docs. 63 and 76). As part of the plea agreement, Romero acknowledged he was subject to an enhanced sentence in the matter. (Doc. 63 at 2-3).

The PSR writer found Romero responsible for at least 500 grams but less than two kilograms of cocaine. PSR ¶ 25. This drug amount resulted in a base offense level of 26. PSR ¶ 26. Typically, Romero would have faced a base offense level of 23 and a criminal history category of IV, but the Court concluded Romero was a career offender due to his two prior convictions for felony-controlled substance offenses. PSR ¶ 33. Therefore, he faced a total offense level of 31 and a criminal history category of VI, which resulted in an advisory guideline range of 188 to 235 months of imprisonment. On December 12, 2012,

this Court sentenced Romero to a term of 235 months of imprisonment and six years of supervised release.  (Doc. 114 at 2-3).

As stated above, Romero is in custody at Edgefield FCI.  He has served approximately eight-and-a-half years of his sentence, which equates to serving approximately 50% of his statutory time.[1]  (Exhibit 1 at 391).  Romero has had four disciplinary incidents while in custody, including fighting with another inmate, operating a business without authorization, and being insolent to a staff member.  (Exhibit 1 at 1-2).

## II.    Romero's Medical Records

The United States has obtained Romero's medical records from the Bureau of Prisons.  (Exhibit 1 at 3-389).  The medical records show that Romero is a 53 year-old male with minimal medical conditions.  *Id.*  In 2020, medical staff in the BOP treated Romero for Hepatitis C, and, through this successful treatment, he is now cured.  (Exhibit 1 at 226).  Romero also has elevated blood pressures at times, and began an assessment for sleep apnea in November 2020.  (Exhibit 1 at 234, 237).  A thorough review of Romero's medical records shows that any mild

---

[1] Romero's medical records are filed under seal pursuant to L.R. CR 49.3(a)(2)(C), as the documents contain confidential medical information for which redaction is not practical.  In addition, Romero's BOP disciplinary history and sentencing computation documents are filed under seal for the same reasons.

medical conditions that he may experience do not meet the standards set for in U.S.S.G. § 1B1.13(1)(A).

### III.    Romero's Motion for Release

Romero initially filed his request for release with the BOP on March 31, 2020.  (Exhibit 3 at 1-13; Doc. 226-1).  The warden denied his request on April 27, 2020.  (Exhibit 2).  Romero filed an appeal, and the regional director denied Romero's appeal on November 2, 2020.  (Doc. 226-1 at 12).  The regional director cited that Romero "[has] a medium risk level of recidivating," and that he is "assigned a Medical Care Level 2 assignment, which supports the institution's assessment that [his] medical condition is considered stable."  (Doc. 226-1 at 12).

On December 22, 2020, Romero filed his motion for compassionate release with this Court.  (Doc. 226).   In his motion, Romero argues that his "extraordinary and compelling reasons" for a reduction in his sentence are not because of Covid-19 and medical concerns, but rather because he contests his prior convictions that formed the basis of his career offender status.  (Doc. 226 at 4).  Romero notes a few medical conditions, but the basis of his request appears to be his disagreement with his career offender designation.  (Doc. 226 at 5).

Romero has been litigating his sentence since 2015, and this Court should not use Romero's motion for compassionate release as an avenue for a sentence reduction when it has denied all of Romero's previous arguments.  *See United*

*States v. Marrero*, 11-CR-568 (PKC), 2020 WL 7079483, at *3 (S.D.N.Y. Dec. 3, 2020) (court rejected defendant's compassionate release motion with argument that he should be resentenced without career offender guideline).

On January 9, 2015, this Court denied Romero's first motion to reduce his sentence. (Docs. 136, 137). In 2017, the Ninth Circuit affirmed this Court's ruling. (Doc. 161; *United States v. Romero,* 675 Fed. Appx. 777 (9th Cir. 2017) (unpublished). In the meantime, Romero filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255, on the same basis that his two prior felony drug convictions did not qualify as predicate offenses for the career offender enhancement. (Docs. 157, 168). This Court denied Romero's claims. (Doc. 168 at 13). Romero appealed. (Doc. 205). The Ninth Circuit denied Romero's appeal in October 2019. *United States v. Romero*, No. 18-35936 (9th Cir. 2019) (unpublished).

Romero filed a motion for reduction of his sentence in June 2019 pursuant to the First Step Act. (Doc. 208). This Court denied Romero's motion, and stated, it "[did] not view Romero's motion as seeking compassionate release under 18 U.S.C. § 3582(c)(1)." (Doc. 221 at 4). Romero filed an additional § 2255 motion on April 27, 2020 (Doc. 222), and this Court dismissed Romero's motion on July 29, 2020. (Doc. 223). Again, Romero filed a § 2255 motion on December 10, 2020 (Doc. 224), and this Court dismissed the motion on December 15, 2020.

(Doc. 225).  Romero filed his present compassionate release motion on December 22, 2020.  (Doc. 226).

As the Court in *Marrero* noted, "[a] likelihood or even certainty that the defendant would receive a lower sentence if sentenced today is not, standing alone, an extraordinary and compelling reason for a sentence reduction." *Marrerro*, 2020 WL 7079483 at \*3.

### IV.        Bureau of Prisons' Response to COVID-19

The BOP has taken aggressive steps to protect inmates' health and to keep COVID-19 outside of its facilities.  "[M]aintaining safety and security of BOP institutions is [the BOP's] highest priority."  BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (March 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.  Indeed, the BOP has longstanding procedures for managing the threat of infectious disease—including protocols relevant to a variety of potential infections.  *See, e.g.*, BOP Program Statement No. 6190.04, Infectious Disease Management (June 3, 2014), available at https://www.bop.gov/policy/progstat/6190_004.pdf.  Tellingly, the BOP has had a detailed "Pandemic Influenza Plan" in place since 2012.  *See* BOP Health Services Division, Pandemic Influenza Plan (October 2012), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.

The BOP began planning for COVID-19 in January 2020, when it began developing policies in consultation with the Centers for Disease Control. *See* BOP, COVID-19 Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP Action Plan"), *available at* https://www.bop.gov/resources/news/20200313_covid-19.jsp; *see generally* BOP, COVID-19 Coronavirus (updated regularly), *available at* https://www.bop.gov/coronavirus/index.jsp. Subsequently, in mid-March, the BOP implemented an action plan to "mitigate the spread of COVID-19" in prisons for the protection of both inmates and staff. *See* BOP Action Plan, *supra*. In addition, BOP facilities have medical care available to all inmates.

Currently, the BOP is aggressively distributing and administering the Covid-19 vaccine to staff and inmates at BOP facilities. *See* https://www.bop.gov/resources/news/20210116_covid_vaccine_efforts_commende d.jsp. (last visited, Jan. 17, 2021). As of January 15, 2021, the BOP has administered at least one dose of the vaccine to 5,457 inmates, and the vaccine has been distributed to more than half of the BOP correctional facilities. *Id.*

## V.        Administrative Options Available to Inmates

Inmates with COVID-19-based concerns have a variety of administrative options they can pursue through the BOP itself. Although not reviewable by courts, these options include far more flexible remedies than permanent reduction

of a sentence under 18 U.S.C. § 3582(c)(2). *See generally* 18 U.S.C. § 3621(b) (precluding judicial review of BOP placement decisions); *Reeb v. Thomas*, 636 F.3d 1224, 1226-28 (9th Cir. 2011) (courts lack jurisdiction to review BOP's placement decisions under 18 U.S.C. §§ 3621-24).

First, the BOP can place eligible inmates in home confinement. *See generally* 18 U.S.C. § 3624(c)(2). The recently enacted CARES Act, which Congress passed to address the COVID-19 crisis, will substantially increase BOP's statutory authority to do so. *See* Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (March 27, 2020) (allowing BOP to "lengthen the maximum amount of time the Director is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2)). The Attorney General has ordered the BOP to exercise its home-confinement authority broadly to protect "the people in [their] custody," taking into consideration prisoners' age, vulnerability to COVID-19, and other factors. *See* Attorney General, Memorandum for Director of Bureau of Prisons Re: Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020), *available at* https://www.justice.gov/file/1262731/download.

Second, BOP has authority to grant an inmate a temporary furlough from custody under 18 U.S.C. § 3622, for "obtaining medical treatment not otherwise

available" or "any other significant activity consistent with the public interest." *See* BOP Program Statement No. 5280.09, Inmate Furloughs (January 20, 2011), *available at* https://www.bop.gov/policy/progstat/5280_009.pdf. Certain COVID-19-related conditions would potentially satisfy the BOP's requirements for such a furlough.

Third, under 18 U.S.C. § 3582(c)(1)(A)—which, unlike BOP's placement decisions, allows for judicial review—the BOP has initial authority to assess inmates' applications for compassionate release. The BOP has detailed regulations setting forth relevant procedures and considerations. *See* BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

## LEGAL FRAMEWORK

A district court generally "may not modify a term of imprisonment once it has been imposed . . . ." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824-25 (2010). Compassionate release is one of the few exceptions to this rule, allowing a court to "reduce the term of imprisonment (and . . . impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) . . . ." 18 U.S.C.

§ 3582(c)(1). This relief, however, is permanent and therefore subject to strict statutory conditions.

First, a district court can evaluate a defendant's request for compassionate release only "after the defendant has fully exhausted all administrative rights" before the BOP. 18 U.S.C. § 3582(c)(1)(A). Specifically,

> [A]fter the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]

*Id.* This requirement is mandatory and jurisdictional. *See generally Shaw v. Bank of America Corp.*, 946 F.3d 533, 541 (9th Cir. 2019) ("statutorily-provided exhaustion requirements deprive the court of jurisdiction") (quoting *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1197 (9th Cir. 1998)); *United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *7-9 (D. Or. Apr. 6, 2020) (collecting cases).

Second, in evaluating compassionate-release requests, courts must follow both the statute and relevant, binding policy statements. USSG § 1B1.13. Pursuant to those authorities, to be eligible for compassionate release, a defendant must demonstrate: (1) the existence of extraordinary and compelling reasons, within the meaning of the statute; and (2) that she is not a danger to the community. Specifically, 18 U.S.C. § 3582(c)(1)(A) requires that any reduction be "consistent with applicable policy statements issued by the Sentencing

Commission"—in this case, USSG § 1B1.13.  As the Supreme Court recognized in *Dillon*, because § 3582(c) permits a sentencing reduction only where it is "consistent with applicable policy statements issued by the Sentencing Commission," such policy statements are binding on a court determining eligibility.  560 U.S. at 826.

USSG § 1B1.13 explicitly defines the "extraordinary and compelling reasons" that make a defendant eligible for compassionate release.  *See* 28 U.S.C. § 994(t).  They include, as relevant here, (1) a "terminal illness"; (2) a serious medical condition that "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; or (3) a defendant who is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  USSG § 1B1.13 (other grounds omitted). USSG § 1B1.13, comment. (n.1(A)-(B)).  "[R]ehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.*, comment. (n.3).

A defendant bears the burden to prove both that he has "exhausted all administrative rights" and that "extraordinary and compelling reasons" exist to support his motion.  18 U.S.C. § 3582(c)(1)(A); *see also United States v. Greenhut*,

No. 18-CR-48-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (defendant bears the burden of establishing entitlement to sentencing reduction) (*citing United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998)); *United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *3 (D. Or. Apr. 6, 2020) (same).

Third, even for defendants who are statutorily eligible, compassionate release is a "rare" and "extraordinary" remedy, within district courts' discretion to deny. *United States v. Mangarella*, No. 06-CR-151, 2020 WL 1291835, at *2 (W.D.N.C. Mar. 16, 2020). Specifically, "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted. *See, e.g., United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention cases); *accord United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) ("[M]ost courts treat compassionate release 'due to medical conditions [a]s . . . a rare event.").

## ARGUMENT

**The government does not contest that Romero has exhausted his administrative remedies.**

The BOP denied Romero's appeal on November 2, 2020. All exhaustion requirement under the First Step Act have been met. As such, the government does not contest that Romero has met his burden as to the exhaustion requirement.

## I.     Reduction of Romero's sentence is not warranted.

This Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court "finds that" either "extraordinary and compelling reasons warrant such a reduction[,]" or the defendant is at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The pertinent policy statement is set forth at United States Sentencing Guidelines (USSG) § 1B1.13. It prohibits this Court from reducing a defendant's sentence unless the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Sentencing Commission provides explicit examples of what constitutes an "extraordinary and compelling circumstance":

(A) **Medical Condition of the Defendant.**—

    (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

   (ii) The defendant is—

     (I) suffering from a serious physical or medical condition,

     (II) suffering from a serious functional or cognitive impairment, or

     (III) experiencing deteriorating physical or mental health because of the aging process,

     that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

 (B) **Age of the Defendant** — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

 (C) **Family Circumstances.** —

   (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

   (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

USSG § 1B1.13 cmt. n.1.[2] Thus, in order to qualify for compassionate release

---

[2] Application Note 1(D), the final example listed by the Sentencing Commission, is inapplicable to this situation. It provides as follows: "**Other Reasons.** — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." USSG § 1B1.13 cmt. n.1. In turn, BOP promulgated Program Statement 5050.50, amended effective January

having exhausted his or her administrative remedies with the Bureau of Prisons, a defendant must be able to demonstrate one of the listed reasons in (A)–(C) above. Romero cannot do so because he cannot show (1) a serious medical condition preventing self-care within BOP; (2) a lack of danger to the community; (3) extraordinary or compelling reasons to reduce his sentence; and (4) release is warranted under the factors set forth in 18 U.S.C. § 3553(a).

### A. Romero has not shown he has a serious medical condition that substantially diminishes his ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover.

The medical basis for the defendant's motion is that he suffers from a myriad of medical conditions, including Hepatitis C. He does not, however, claim that his Hepatitis C, or that any of the other conditions—Sirois of the liver, spinal meningitis, a pinched vertebra, or mental health issues—are unmanageable with help from the BOP. (Doc. 226 at 5.) Nor does he claim that these conditions render him uniquely at risk to COVID while in BOP custody. Nor could he, under current CDC guidance. The CDC has identified certain conditions that put people at an increased risk of severe illness. Hepatitis C is not among those conditions.

_____

17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. In this case, there is no need for the Court to rely upon the determination of the Bureau of Prisons on other reasons. Because Bureau of Prisons has not brought a motion on Defendant's behalf, the Bureau of Prisons did not identify another "extraordinary and compelling reason" under the application note.

See CDC, People with Certain Medical Conditions.   The CDC has also identified conditions that "might" put people at an increased risk of severe illness.  *Id.* Hepatitis C is not listed among those conditions either.  *Id.*  Accordingly, per the CDC, there is no basis to conclude that the defendant's potential medical condition puts him at any higher risk than any other inmate in the BOP system.

As previously stated, the United States has obtained the defendant's medical records from the BOP.  (Exhibit 1).  Based on the medical records, it is clear that Romero is receiving proper medical care for his medical conditions at the facility and his conditions, if any, are well-controlled.  In fact, the records state his hepatitis C has been cured.  (Exhibit 1 at 226).  As such, he cannot meet the high bar to prove an "extraordinary and compelling reason" for release.

Additionally, to meet the extraordinary and compelling reason standard under the compassionate release statute Romero also has to show that his ability for self-care within the facility has been diminished.  Here, however, Romero provides no evidence that his conditions are deteriorating or that his ability for self-care has been diminished while in the BOP facility.  Since he fails to bring any evidence in support of that factor, he also cannot meet the standard for compassionate release based on a medical condition as defined under U.S.S.G. § 1B1.13.  Based on the above-mentioned reasons, the possibility of a COVID-19

infection does not show an extraordinary and compelling reason to release the defendant early from his sentence.

### B.    Romero remains a danger to the community.

This Court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13.  The record precludes such a finding.

To determine whether someone poses a danger to the community, this Court must look to the factors set forth in 18 U.S.C. § 3142(g).  Under § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g)(1)-(4).  Consideration of these factors— which are not affected by COVID-19—does not allow this Court to conclude that Romero is not a danger to the safety of any other person or the community.

### 1. Nature and circumstances of the charged offense

A quick overview of the underlying conduct in this case highlights the seriousness of Romero's offenses. As stated above, Romero was the leader of a large-scale, out-of-state, drug ring that distributed cocaine and other drugs to communities in Montana. PSR ¶¶ 14-20. He provided firearms to involved parties, distributed extremely large quantities of drugs, and displayed acts of violence. PSR ¶ 38.

### 2. Weight of the Evidence

Although the Ninth Circuit treats the weight of the evidence as the least important factor, a judge is still "require[d]" to consider it, and it can help establish dangerousness. *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008). Likewise, evidence of the defendant's guilt "makes it more likely that he will flee." *See United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991).

As stated in the fact section above, Romero pled guilty to conspiracy to possess with intent to distribute cocaine. As such, the weight of the evidence against the defendant was extremely strong.

### 3. Romero's History and Characteristics.

As much as Romero fights his status as a career offender, at the time of his sentencing, he was a career offender due to his extraordinary criminal history. PSR ¶¶ 45-57. At the time of his conviction in 2012, he had been selling narcotics

since he was 18 years old.  PSR ¶ 44.  Besides drugs, Romero had a history of

violating court orders of protection.  PSR ¶¶ 48-50.

> **4.    Nature and seriousness of the danger to any person or the community that would be posed by the person's release.**

Romero's conduct in this case show that he would continue to pose a danger

to the community if released.  Romero was responsible for bringing a significant

amount of cocaine into Montana communities, as well as other areas, and it is

unclear that his proposed living situation would result in a successful transition

from imprisonment.  Lastly, the BOP still considers Romero to have a "medium

risk level of recidivating."  (Doc. 226-1 at 12).

> **C.    COVID-19 does not present "extraordinary or compelling reasons" to reduce this defendant's sentence.**

Although the COVID-19 pandemic is an extraordinary world event, Romero

has failed to show that that its impact on him, specifically, constitutes

"extraordinary and compelling reasons" warranting his immediate release pursuant

to 18 U.S.C. § 3582(c)(1)(A).  Romero likely does not meet any of the listed

reasons in USSG § 1B1.13, nor can he describe any particularized reason why he

should be released apart from any other convicted defendant serving time in

Edgefield FCI.  "General concerns about possible exposure to COVID-19 do not

meet the criteria for extraordinary and compelling reasons for a reduction in

sentence set forth in the Sentencing Commission's policy statement on

compassionate release, U.S.S.G. §1B1.13." *United States v. Eberhart*, No. 13-CR-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020). The Third Circuit echoed this principle in an appeal by an inmate at heightened risk because of his age (68) and health condition (Parkinson's Disease, diabetes, and heart issues):

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. *See generally* Federal Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

*Raia*, __ F.3d __, 2020 WL 1647922, at *1-2.

Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted. *See, e.g.*, *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention cases). Despite the COVID-19 pandemic, Romero's case is not one of those rare cases. Romero has not demonstrated that his current facility is unequipped to provide appropriate medical treatment if he were to become sick. He has not therefore shown that release is necessary to protect his health.

BOP has protocols in place to combat the spread of viruses like COVID-19. Indeed, BOP has been planning for potential coronavirus transmissions since

January.  BOP has continued to implement more stringent protocols as events have unfolded.  Romero does not claim to be infected with COVID-19 or that he was denied necessary medical treatment or care for exposure to COVID-19 or for any other medical condition.  Nor can Romero establish that should he contract COVID-19 while in custody, the facility would be unable to administer constitutionally acceptable treatment.

> ### D.      Even if Romero were otherwise eligible for compassionate release, 18 U.S.C. § 3553(a) factors do not support a shorter sentence.

Finally, any compassionate-release decision—even for a statutorily eligible defendant—must also consider the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A).  Those factors—which are similar to the factors under 18 U.S.C. § 3142(g)—do not support her request for premature, permanent release.  Any consideration of release now should be balanced against the same 3553(a) factors – such as deterrence, just punishment, respect for the law, and avoidance of disparity of sentencings – that were considered at sentencing.  Romero has served just over 43% of his full term, and 50% of his statutory term.  (Exhibit 1 at 391).

Based on the foregoing, it is highly unlikely that release now would satisfy any of the 3553(a) goals this Court had in mind – in particular deterrence, just punishment, and respect for the law - when Romero was sentenced.  As such, an analysis of the 3553(a) factors also does not support consideration for release in this case.

## CONCLUSION

The United States respectfully requests that Romero's motion for release be denied.

DATED this 17th day of January 2021.

LEIF M. JOHNSON
Acting United States Attorney

*/s/ Jessica A. Betley*
JESSICA A. BETLEY
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to D. Mont. LR 7.1(d)(2) and CR 12.1(e), the United States' response to Defendant's motion for release to home confinement is proportionately spaced, has a typeface of 14 points or more, and has a body containing 4,849 words.

*/s/ Jessica A. Betley*
JESSICA A. BETLEY
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2021, a copy of the foregoing document

was served on the following persons by the following means:

__1___ CM-ECF
_____ Hand Delivery
__2___ Mail
_____ Overnight Delivery Service
_____ Fax
_____ E-Mail

1.      Clerk, United States District Court

2.      Louis Romero, Register Number 42359-086
        FCI Edgefield
        Federal Correctional Institution
        P.O. Box 725
        Edgefield, SC  29824
        (By certified mail)

                                        *Jessica A. Betley*
                                        Assistant U.S. Attorney
                                        Attorney for Plaintiff